1  BRUCE J. WECKER (CA Bar No. 078530)
2  bwecker@hausfeld.com
   HAUSFELD LLP
3  600 Montgomery Street, Suite 3200
4  San Francisco, CA 94111
   415-633-1908 tel, 415-358-4980 fax
5  *Attorneys for Plaintiff FULLVIEW, INC.*

6

7              **UNITED STATES DISTRICT COURT**

8          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10

11 | FULLVIEW, INC.,                    | Case No. 3:18-cv-00510 EMC
   |     a Delaware corporation,        |
12 |                                    | **PLAINTIFF FULLVIEW'S OPPOSITION**
   |                      Plaintiff,    | **TO DEFENDANT POLYCOM'S MOTION**
13 |     vs.                            | **TO EXCLUDE DAMAGES OPINIONS**
   |                                    | **AND TESTIMONY OF VISHVJIT S.**
14 | POLYCOM, INC.,                     | **NALWA AND KRISHNAN RAMADAS**
15 |     a California corporation,      |
   |                                    | Judge:        Hon. Edward M. Chen
16 |                      Defendant.    | Venue:        Courtroom 05, 17th Floor
   |                                    | Hearing Date: July 10, 2025
17 |                                    | Time:         1:30 pm

18

19

20

21

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................... 1

II.  LEGAL STANDARD ................................................................................................... 3

III. ARGUMENT ................................................................................................................ 4

    A.  Controlling Authority Supports Non-Apportionment Between '711 and '143 Patents ...... 4

    B.  FullView's Damages Claim Complies Fully With *Georgia-Pacific* ............................... 10

    C.  Dr. Nalwa is Qualified to Provide the Testimony and Opinions He Provides ................. 13

        1.  On Apportionment ........................................................................................... 13

        2.  On The M–P License ....................................................................................... 14

        3.  On Patent-Related Matters ............................................................................. 15

    D.  The Ramadas Expert Report is Independent .................................................................. 16

    E.  FullView's Response to Opinions and Testimony Polycom Seeks to Exclude ................ 17

IV. CONCLUSION ........................................................................................................... 23

# TABLE OF AUTHORITIES

*Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ................................ 22

*Apple Inc. v. Motorola, Inc.*, 757 F. 3d 1286 (Fed. Cir. 2014) ...................................................... 22

*AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015) ...................................... passim

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,* 807 F.3d 1283 (Fed. Cir. 2015)............. 4, 13

*Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341 (Fed. Cir. 2019) .............................. 1

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)............................................ 3

*Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201 (Fed. Cir. 2014) ............................................. 5

*Exmark Manufacturing Company Inc. v. Briggs & Stratton Power Products Group LLC*, 879 F.3d 1332 (2018)............................................................................................................................ 8

*Garretson v. Clark*, 111 U.S. 120 (1884)........................................................................................ 5

*Georgia–Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116 (S.D.N.Y. 1970) .................... 9

*Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 2628620 (C.D. Cal. Mar. 15, 2023). 17, 22, 23

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ............................... 9

*Monsanto Co. v. David*, 516 F. 3d 1009 (Fed. Cir. 2008) ............................................................ 22

*Pascal v. Nissan N.A., Inc.*, 2022 WL 19076763 (C.D. Cal. Dec. 21, 2022) .............................. 16

*Vectura Limited v. Glaxosmithkline LLC*, 981 F.3d 1030 (Fed.Cir.2020).................................. 10

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. Mfg. Co.*, 225 U.S. 604 (1912)......................... 7

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff FullView, Inc. ("FullView") hereby opposes Motion of Defendant Polycom, Inc. ("Polycom") to Exclude Opinions and Testimony of Vishvjit S. Nalwa and Krishnan Ramadas ("Motion"). Attached is a Declaration of Vishvjit S. Nalwa in Support of FullView's Opposition to Defendant's Motion to Exclude Opinions and Testimony ("Nalwa Decl.").[1]

Polycom's Motion should be denied in all respects other than those FullView identifies below. The issues Polycom raises do not undermine the reliability of the opinions and testimony of Dr. Nalwa or Mr. Ramadas but point to what is best resolved through a cross-examination of witnesses. Polycom's Motion should *inter alia* be denied because:

(a)    Polycom ignores without explanation key facts tied to this case despite the undisputed and explicit demonstration of these facts in Dr. Nalwa's expert report dated March 17, 2025.

(b)    Polycom insists, despite plain evidence to the contrary, that FullView's experts do not provide independent opinions.

(c)    Polycom even ignores relevant holdings set out in binding case law precipitated by one of its counsel's previously unsuccessful apportionment arguments that parallel its arguments here.[2]

Polycom's central thesis is that apportionment of royalty in a comparable license, or in an offer of such a license, is always required, ***without exception,*** no matter what the facts of the case. It insists that "a century of controlling precedent" provides no exception. Motion at 1, 8. It argues that violation of this dictate in FullView's expert reports justifies their wholesale exclusion.

---

[1] There are four reports at immediate issue here:
1. Expert Report of Dr. Vishvjit S. Nalwa dated March 17, 2025 ("NR"). ECF 276-5.
2. Expert Report of Mr. Krishnan Ramadas dated March 26, 2025 ("RR"). ECF 276-6.
3. Expert Report of Mr. Kurtis Keller dated April 23, 2025 ("KR"). ECF 276-7.
4. Expert Report of Mr. W. Christopher Bakewell dated April 23, 2025 ("BR"). ECF 276-8.

[2] During §101 oral argument on the '711 Patent, Polycom's counsel told the Court how she lost — in *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341 (Fed. Cir. 2019) — an argument that paralleled FullView's §101 argument before this Court. ECF 100 at 7. But what Polycom fails to disclose now is that — in *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015) — another of its counsel lost an argument that parallels Polycom's present apportionment argument.

1    But Polycom's protestations on apportionment are disingenuous at least because:

2    (a)    ***Polycom knows better*** from binding precedent, cited by it for a subsidiary holding, in

3           which one of its counsel represented the defendant.

4    (b)    ***FullView apportions in the alternative*** in a manner undisputed by Polycom on the merits.

5           As part of his analysis of apportionment, Dr. Nalwa examines in his report all 14 patents

6    in FullView's patent portfolio, one by one. He then explains in his report how the '711 and '143

7    Patents, which are the only two patents asserted by FullView in its complaint, are also the only

8    two patents relevant to apportionment of FullView's portfolio royalty in a license for the accused

9    products. This analysis is undisputed except for a frivolous argument by Mr. Bakewell — that Mr.

10   Ramadas did not consider that patents that have expired for willful nonpayment of maintenance

11   fees could be resuscitated, presumably by falsely attesting to the inadvertence of FullView's non-

12   payment of maintenance fees, BR at ¶324 — and an unreliable argument by Mr. Keller that the

13   '143 Patent has no value, despite his previous insistence under oath that advantages of the '143

14   patent are "common sense." *See* ECF 180-9 at ¶¶12, 14, 19, 20.

15           Dr. Nalwa then explains how — because the benefits of the '711 Patent are realized in a

16   practical, robustly accurate, and compact manner through the '143 Patent, as they were in the

17   RoundTable product — the apportionment of any portfolio royalty for FullView's patents even

18   between the '711 and '143 Patents would be inapt.

19           Controlling case law supports Dr. Nalwa and FullView on non-apportionment. In a

20   strikingly similar case, apportionment between the conventional elements of a patent claim and its

21   inventive aspects was rejected because "a patent that combines 'old elements' may 'give[ ] the

22   entire value to the combination' if the combination itself constitutes a completely new and

23   marketable article." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338–39 (Fed. Cir. 2015).

24   ("*AstraZeneca*"). In that case, the pharmaceutical at issue consisted of two inventive components,

25   the active ingredient and the innovative means of delivering that ingredient through the digestive

26   tract to the small intestine. The patents for the active ingredient had expired, but those relating to

27   the delivery mechanism were active, of which two were in suit. Apportionment, the court held,

28   need not treat the active ingredient patents as non-infringing elements and exclude them from

1    damages claims. The benefits of the '711 Patent (whether or not patentable) are realized in a

2    practical, robustly accurate, and compact manner through the '143 Patent. Thus, apportionment of

3    portfolio royalty for FullView's patents between even the '711 and '143 Patents is inappropriate.

4          Despite his opinion that apportionment is inappropriate here, Dr. Nalwa alternatively

5    apportions on a well-reasoned basis, the royalty for FullView's portfolio of 14 patents — several

6    of these 14 patents having expired well before "a hypothetical negotiation" between FullView and

7    Polycom — to the '143 Patent *for the accused products*.

8          Polycom responds by seeking to exclude all opinions of Dr. Nalwa concerning "value" on

9    the basis of his qualifications. In its argument, Polycom fails to clearly distinguish economic value

10    from technical value. As described below, given his long experience in managing FullView's

11    business operations, including in negotiating licenses with Polycom, and in data analysis, it is

12    improper to exclude Dr. Nalwa's testimony as Polycom seeks.

13          Polycom argues that NR at ¶¶61–159, 316–390 should be excluded because Dr. Nalwa is

14    not qualified to "opine on damages-related matters." Motion at 9. What Polycom is *inter alia*

15    seeking to exclude is Dr. Nalwa's coherent organization of the evidence to make clear its

16    implications, which is what data analysts do. The fact that the analysis relates to damages neither

17    addresses the reliability nor the relevance of Dr. Nalwa's testimony and opinions. *See, e.g.,* NR at

18    Table 1 (Page 34), Table 2 (Page 43), Table 3 (Page 102), and Table 4 (Page 113). Polycom is also

19    seeking to exclude all of Dr. Nalwa's apportionment and technical analysis in NR at ¶¶316–390,

20    analysis that not only aligns with case law but also is undisputed on the merits. This analysis

21    includes analysis of the resolution limit that Polycom would require for the accused products.

22          Polycom's criticism of Mr. Ramadas' report is limited to its reliance on Dr. Nalwa's report,

23    but even there, it misrepresents both Mr. Ramadas' report and his deposition, as described below.

24    ## II.  LEGAL STANDARD

25          Rule 702 is the basis of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579

26    (1993) ("*Daubert*"):

27

28

**Rule 702. Testimony by Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The emphasis in Rule 702 after *Daubert* [] is "on the substance of expert testimony and with the facts that experience can be gained in many venues and that knowledge can be demonstrated by mastery displayed in an expert's analysis and responses to questioning about it." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,* 807 F.3d 1283, 1303 (Fed. Cir. 2015).

## III.  ARGUMENT

### A.  Controlling Authority Supports Non-Apportionment Between '711 and '143 Patents

In *AstraZeneca,* the court addressed a situation highly analogous to the present one.

AstraZeneca ("Astra"), the manufacturer of the drug Prilosec, sued Apotex, a manufacturer of generic pharmaceuticals, for infringement of two of Astra's patents relating to pharmaceutical formulations of omeprazole, the active ingredient in Prilosec. The two patents covered the addition of a water-soluble, inert subcoating that separated the active ingredient from the outer coating of the dosage, protecting the active ingredient from degrading in the stomach on its way to the small intestine, its intended destination. Astra owned patents on both the active ingredient and the formulation for delivering it. But patents on the active ingredient had expired in 2001, before the alleged infringement began, while several patents covering the delivery formulation, including the two in suit, did not expire until 2007.

Apotex began selling its generic omeprazole product in 2003 and discontinued its sales in 2007, after the district court held that Apotex infringed the Astra patents. After affirmance of the liability ruling, the district court held a bench trial on damages, which the parties agreed would be assessed on a reasonable royalty basis. After trial, Apotex appealed, complaining of an excessive damages award, *inter alia* arguing that the district court should have apportioned royalty across

two groups of patents: one group, comprising expired patents, concerning the active ingredient omeprazole and the other group, including the two un-expired patents in suit, concerning the delivery mechanism of the active ingredient. The inventive element of the patents in suit was a water-soluble subcoating. Apotex argued that "because the active ingredient patents had expired at the time of the infringement and the active ingredient had thus become a 'conventional element,' the district court should have calculated damages by apportioning the relative contribution of value between the active ingredient and the 'inventive element' of the patents, *i.e.,* the subcoating."

Apotex premised its argument on applying the Entire Market Value ("EMV") rule, a rule that "applies when the accused product consists of both a patented feature and unpatented features" and one wishes "to account for the contribution of the patented feature to the entire product." *Id.* at 1337. The Federal Circuit rejected the application of the EMV rule in *AstraZeneca,* finding that Astra's formulation patents claim all three key elements of the product — the drug core, the enteric coating, and the subcoating — and that the combination of those elements constitutes the complete omeprazole product that is the subject of the asserted claims. Thus, wrote the Federal Circuit, "[t]here was no unpatented or non-infringing feature in the product." *Id.* at 1338. Nonetheless, the Federal Circuit explained, a related inquiry was appropriate: "when the claims recite both conventional elements and unconventional elements, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone.[3] *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014) ('[T]he patent holder should only be compensated for the approximate incremental benefit derived from his invention.') (citing *Garretson* [*Garretson v. Clark*, 111 U.S. 120 (1884)] at 121)." *Id.* at 1338.

While recognizing that "the standard *Georgia-Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would

---

[3] One may apportion royalty for products with certain features, or licensed under certain patents, to products with a subset of features, or infringing a subset of patents. The court addressed each in turn. When damages rely on a license or offer for more patents than at issue but the product has the same features as that licensed, the first issue dissolves, as it does here.

have emerged from the hypothetical negotiation," the Federal Circuit critically also observed that "while it is important to guard against compensation for more than the added value attributable to an invention, it is improper to assume that a conventional element cannot be rendered more valuable by its use in combination with an invention." *Id.* at 1338

"It is not the case that the value of all conventional elements must be subtracted from the value of the patented invention as a whole when assessing damages. For a patent that combines 'old elements,' removing the value of all of those elements would mean that nothing would remain." *Id.* at 1339. The Federal Circuit concluded that the district court had answered the relevant question: "how much new value is created by the novel combination, beyond the value conferred by the conventional elements alone." *Id.* The district court had rejected Apotex's claim that "the patented formulation constituted only a minor, incremental improvement over the active ingredient" and found instead that "the formulation 'substantially create[d] the value' of the entire omeprazole product." *Id.* This was because, despite the effectiveness of omeprazole in reducing the production of gastric acid, it is notoriously difficult to formulate omeprazole into an effective pharmaceutical. "After years of effort, Astra's scientists determined that a water-soluble subcoat helped solve many of these problems and allowed them to formulate a commercially viable drug." *Id.* The district court had found that Astra's prior formulations were not commercially viable.

What good is an "active ingredient" that cannot be "delivered"? As Dr. Nalwa analogously explained in his report, NR at ¶347, "To exploit an invention, one must know how to practice that invention practically, robustly, and accurately: ***gainfully.***"

The Federal Circuit agreed that Astra's delivery formulation thus created a new, commercially viable omeprazole drug. This product was previously unknown in the art and was novel in its own right. Accordingly, the district court had permissibly found no reason to exclude the value of the active ingredient when calculating damages in this case. The present case contains the very same type of evidence that swayed the courts in *AstraZeneca*.

It is undisputed that the '143 Patent describes a support member intersecting the panoramic viewing apparatus of the '711 Patent. In fact, the specification of the '143 Patent recites the specification of the '711 Patent almost verbatim before continuing on. Moreover, what is key in

the '711 Patent vis-à-vis its prior art is that its virtual optical centers are offset unlike in the Iwerks Patent and in other prior art. And asserted claim 10 of the '143 Patent reads, emphases added:

**10.** A panoramic viewing apparatus, comprising:

plurality of image processing devices, each having an optical center and a field of view;

a pyramid shaped element having a plurality of reflective side facets facing in different directions, each of at least two of the plurality of reflective side facets redirecting a field of view of one of the plurality of image processing devices to create ***a plurality of virtual optical centers;*** and

***a support member intersecting an inner volume of the pyramid shaped element***, the pyramid shaped element being secured to the support member and the plurality of image processing devices being secured to the support member.

In unrebutted testimony in his expert report, Dr. Nalwa demonstrated how the Bowie Prototype, which practiced the teachings of the '711 Patent but not of the '143 Patent, was unsatisfactory in ways that would thwart commercially viability. NR at ¶¶10–11, 43–44, 47–48, 52–53. Only when in fact FullView tried to meet the needs and expectations of its most important customer, the U.S. Navy, did Dr. Nalwa realize after substantial additional work the criticality of the '143 Patent's configuration of the support member in "delivering" a robustly accurate, compact, efficient, and practical implementation of the '711 Patent to produce commercially viable cameras capable of providing high-resolution seamless images, such as Dr. Nalwa reproduced in his expert report. NR at ¶¶10–11, 40–55.

There is no dispute in this case that RoundTable and its successor products represented a "completely new and marketable article": Whereas, consistent with this Court's §101 decision, the '711 Patent taught the geometry of a mirror–camera arrangement that would provide seamless composite images, it is the '143 Patent that provided a novel and nonobvious means of "delivering" such seamless composite images "robustly, accurately, compactly, efficiently, and practically." NR at ¶102. Here, as in *AstraZeneca*, contrary to Polycom's insistence, "it is improper to assume that a conventional element cannot be rendered more valuable by its use in combination with an invention ... [Rather,] it has long been recognized that a patent that combines 'old elements' may 'give[ ] the entire value to the combination' if the combination itself constitutes a completely new

and marketable article." *Id.* at 1338-39 (quoting *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. Mfg. Co.*, 225 U.S. 604, 614 (1912)).

Just as it is notoriously difficult to formulate an effective pharmaceutical, seamless composite images had remained elusive since well before the Iwerks Patent from the early 1960s. More than three decades had gone by since the Iwerks Patent — which taught a mirror-camera arrangement that provides coincident virtual optical centers — before the '711 Patent proffered the "active ingredient" to produce seamless composite images: Offset viewpoints in a pyramidal-mirror-with-cameras arrangement. Dr. Nalwa described the invention of the '711 Patent in a technical memorandum he published in January 1996, Nalwa 1996, whose copy he provided to UNC in February 1996. Armed with this copy, with millions in NSF funding, three groups working on the UNC Cluster across UNC, University of Utah, and Brown University were unable to produce seamless panoramas. NSF eventually ceased funding their effort and directed its funding to USC instead, which in 2000, purchased a FullView product FC-1005 that implemented both the '711 and '143 Patents. Nalwa Decl. at ¶7. Even the lone remaining prior art, Yamazawa, which cites Nalwa 1996 but preceded the '143 Patent, was admittedly unable to provide seamless composite images. NR at ¶104.

The treatment of the '143 and the '711 Patents by FullView's experts in apportioning portfolio royalty in damages calculations is thus entirely consistent with *AstraZeneca,* a case with which Polycom is not only intimately familiar but also cites — for an irrelevant proposition.[4]

As for the applicability of the EVR rule, another relevant case is *Exmark Manufacturing Company Inc. v. Briggs & Stratton Power Products Group LLC*, 879 F.3d 1332 (2018), in which the Federal Circuit relied on *AstraZeneca* to affirm a damages award based on the sales of the

---

[4] Oddly, Polycom's Motion does not acknowledge *AstraZeneca's* principal holding of import here. It instead focuses on an undisputed proposition that royalties may not be claimed for sales after an asserted patent has expired. Only Polycom's own expert, Mr. Bakewell, claims that expired patents should be included in an apportionment analysis. BR at ¶324. This brings into question whether counsel for Polycom cites *AstraZeneca* for an irrelevant holding merely to purportedly meet its obligation under ABA's Model Rules of Professional Conduct, Rule 3.3(a), that a lawyer must not "fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel."

accused lawn mowers despite the inventive aspects of the patent in suit being limited to the lawn mower's flow control baffle that efficiently directed grass clippings to improve the quality of grass cut. Three principal reasons drove the court to its conclusion in this case:

1. First, the claimed apparatus was the entire multiblade mover itself, not just a single component of a multi-component product. *See* 879 F.3d at 1348. Thus, there was no unpatented or non-infringing feature of the product.

2. Second, a standard *Georgia–Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116 (S.D.N.Y. 1970) reasonable royalty analysis "takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation." *Id.* at 1348-49.

3. Third, basing damages on mower sales "is consistent with the realities of a hypothetical negotiation and accurately reflects the real-world bargaining that occurs, particularly in licensing. As we stated in *Lucent Technologies, Inc. v. Gateway, Inc.*, '[t]he hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement.' 580 F.3d 1301, 1325 (Fed. Cir. 2009). '[S]ophisticated parties routinely enter into license agreements that base the value of the patented inventions as a percentage of the commercial products' sales price' …."[5]

All these rationales apply equally to the present case. Indeed, the third reason for the court's decision applies here with even greater force — where the evidence of the valuations of the negotiating/licensing parties will be directly available to the jury in the trial record. The comparable licenses and licensing negotiations relied upon by Mr. Ramadas are the real-world equivalent of "a hypothetical negotiation" and show with great precision and certainty, exactly how "a hypothetical negotiation" would have proceeded for the '143 patent in isolation or as part of the entire portfolio. The negotiation between the parties failed only after Polycom made the strategic decision to not take a FullView license if it could not do so on its terms. Polycom then

---

[5] Mr. Ramadas, in his analysis, premises unit sales on the same single uniform MSRP that Polycom presumed in its pre-infringement negotiations with FullView, to preclude royalty for features of the CX8000 and Centro products that are unrelated to the '143 Patent.

1    did some purported diligence on the '711 Patent and decided to fight this patent's validity at PTO

2    while ignoring the '143 Patent and the other 12 patents in FullView's patent portfolio.

3        As for "a century of controlling precedent" mandating apportionment and so on (Motion

4    at 1, 8), another case of immediate relevance is *Vectura Limited v. Glaxosmithkline LLC*, 981 F.3d

5    1030 (Fed.Cir.2020), in which the court addressed a claim for damages that used a comparable

6    license covering more than 400 patents with a cap for sales above a certain amount. The plaintiff

7    introduced evidence, however, that the key component of the license was permitting the defendant

8    to use Vectura's invention of coating lactose particles with magnesium stearate. The license and

9    the hypothetical negotiation therefore covered "roughly very similar technologies," as the

10   plaintiff's damages expert testified in support of her decision to adopt the same royalty rate and

11   royalty base as was used in the comparable license. This similarity of scope was confirmed by the

12   similarities of the coverage of the single infringed patent to the same mixture covered by the

13   comparable license. The court thereupon held that the fact that other patents were included in the

14   comparable license did not undermine the expert's theory of comparability. All of these

15   considerations apply here: The '711 and '143 Patents provide the key component that was also the

16   infringing instrumentality. In the present case, FullView's expert Dr. Nalwa provided a detailed

17   analysis of the lack of relevance of the other 12 patents in its portfolio to the accused products.

18   Polycom's experts have done nothing to prove that any of those patents had value over and above

19   the value to Roundtable provided by the '711 and '143 Patents. Nor has Polycom provided any

20   contravening evidence that it placed any value on those other patents.

21       The case law is thus clear: Although apportionment is often necessary, it may be built into

22   "comparable license" agreements or offers of them, rendering further apportionment unnecessary.

23   **B. FullView's Damages Claim Complies Fully With *Georgia-Pacific***

24       Whereas Dr. Nalwa explains in his report why no apportionment is necessary, he also,

25   alternatively, apportions portfolio royalty to the '143 Patent *for the accused products*.

26       Polycom's technical expert, Mr. Keller responds to Dr. Nalwa's analysis by claiming *ipse*

27   *dixit* that the '143 Patent adds no value to the high-resolution accused products over the low-

28   resolution licensed CX5000. But Mr. Keller also does not ascribe any value to any patent for

CX5000. This put Polycom's damages expert Mr. Bakewell in a bind: He had no choice but to adopt Dr. Nalwa's apportionment for the low-resolution CX5000. However, Mr. Bakewell also adopts Mr. Keller's proposition that the '143 Patent provides no additional value to high-resolution products over low resolution products, even though what Mr. Keller actually postulates if one looks at the entirety of Mr. Keller's report is that no FullView patent has any value at any resolution, a proposition that contradicts Polycom's willingness to pay FullView a royalty both in the Polycom IPA and for the accused products.

If no FullView patent has any value at any resolution, apportionment of portfolio royalty to the '143 Patent at any resolution would not be zero but indeterminate, because the '143 Patent's zero purported value divided by the complete patent portfolio's zero purported value is not zero but indeterminate. Alternatively, if the relative values of the '711 and '143 Patents for CX5000 are unknown, apportionment of portfolio royalty to the '143 Patent at any resolution would again be indeterminate, as Mr. Bakewell apparently realized. ***Polycom is thus bereft of any basis to apportion portfolio royalty to the '143 Patent at any resolution on the basis of its experts' reports.***

Mr. Bakewell's "analysis" of FullView's patents is limited to erroneously claiming that patents that have long expired for intentional nonpayment of maintenance fees can be resuscitated no matter how long they have been expired and why. BR at ¶324. Independently, those six patents have no relevance to "a hypothetical negotiation," as they add nothing to any claim of infringement beyond the '711 and '143 patents, as explained by Dr. Nalwa in uncontested testimony. *See* NR at Table 1 (Page 34), including NOTES.

Mr. Keller's assertion of any Non-Infringing Alternative ("NIA") should, if at all, be put to a jury. While lost profits are dependent on refuting the existence of a NIA, "a reasonable royalty" is the only claim for damages here. In a reasonable royalty case, NIAs are factored into a *Georgia-Pacific* analysis. Not only does Mr. Keller not demonstrate the commercial viability of any NIA, but also, all the evidence, including that of the M–P License, shows that Polycom had no NIA at the time it began its infringement, as Dr. Nalwa has previously explained. ECF 276-2 at ¶¶37–39. Nor does Mr. Bakewell quantify the effect of any purported NIA on "a hypothetical negotiation."

Contrary to Polycom's assertions, FullView's damages are premised on a license to only the '143 Patent between the parties in this litigation and FullView's damages computations are additionally premised on actual negotiations between the parties directly before the infringement began, which best informs how "a hypothetical negotiation" would proceed — using actual evidence of the willingness of both parties to reach agreement in an arms-length negotiation.

Notably, Polycom ***does not*** dispute any factual assertion by Dr. Nalwa: It disputes only his characterization of the facts and whether he is qualified to draw conclusions from them. Polycom does not even particularly dispute his conclusions or provide alternate conclusions. Although Polycom quibbles with Dr. Nalwa's opinions and conclusions, its quibbles are easily resolved.

As for Mr. Ramadas' report, Polycom primarily disputes his adoption of Dr. Nalwa's two apportionment theories — one, no apportionment, and two, apportionment based on no added value of the '711 Patent to high-resolution products over low-resolution products. But there is nothing unusual in a damages expert relying on a technical expert for his or her technical opinions in a patent-infringement case. Polycom's damages expert Mr. Bakewell too relies on Polycom's technical expert Mr. Keller for apportionment — to the extent he can — as is typical in any reasonable royalty damages calculation. Polycom cites irrelevant case law to argue otherwise.

As for Mr. Ramadas' adoption of 5% and 5.9% royalty rates in his willingness-to-accept analysis, the 5% is from the evidence produced by the parties from unsuccessful negotiations between them over a license for the accused products, *see, e.g.,* NR at Table 2 (Page 3). Mr. Ramadas directly examined document productions from these negotiations in an effort to fully understand the negotiating positions of each of the parties and their respective willingness to accept and pay. As for 5.9%, Polycom omits from its Motion, what Mr. Ramadas actually said at his deposition about the 5.9%, ECF 273-5, Tr. at 70:9–19:

Q. The 5.9 percent is not a number that you came up with through an independent calculation, that's a number that was included in Dr. Nalwa's expert report, where he purports to say what FullView would have done at a higher resolution — would have requested at a higher resolution?

A. That is correct, yes. Although, I would add that it's a simple quadratic trend. So it's — it's pretty straightforward math, which I didn't have any, you know, issues with that analysis.

Polycom omits, "Although, I would add …", despite being rebuked by this Court for analogously misrepresenting responses by Dr. Nalwa by omitting their full context. *See* ECF 172 at 10, 16.

### C. Dr. Nalwa is Qualified to Provide the Testimony and Opinions He Provides

As described above, the emphasis in Federal Rule of Evidence 702 after *Daubert* is "on the substance of expert testimony and with the facts that experience can be gained in many venues and that knowledge can be demonstrated by mastery displayed in an expert's analysis and responses to questioning about it." *Carnegie Mellon Univ.* at 1303. Here, that focus demonstrates the reliability of both Dr. Nalwa's and Mr. Ramadas' analyses, testimony, and opinions.

Polycom's suggests that as Dr. Nalwa's degrees are in Electrical Engineering ("EE"), he is unqualified to opine or testify on anything besides that, which ignores his wealth of demonstrated experience — in negotiating scores of contracts, in being intimately involved in FullView's litigation against Polycom, now in its fourteenth year, in successfully representing FullView in an arbitration over the Polycom IPA against Polycom's external counsel, in running a business that manufactures and sells implementations of the '711 and '143 Patents to the U.S. Navy as a Prime Contractor, and in data analysis, a discipline in which he has published as sole author in the most prestigious journal in EE: *Proceedings of the IEEE.* NR at ¶27. Dr. Nalwa's skill at data analysis is reflected in his report's distillation of what the evidence in this case demonstrates.

#### 1. On Apportionment

Polycom's questioning of Mr. Ramadas' reliance on Dr. Nalwa's testimony and opinions on the scope, nature, and technical contribution of FullView's patents is baseless as Dr. Nalwa's testimony and opinions fall squarely within the ambit of Dr. Nalwa's technical expertise:

1. Mr. Kurtis Keller's decades-long supervisor and UNC's Principal Investigator for the UNC Camera Cluster, Professor Henry Fuchs, apologized to Dr. Nalwa in 1999 for not crediting Dr. Nalwa for the UNC Cluster being prompted by Nalwa 1996. NR at ¶103 n 14.

2. A UNC student who's now a professor at MIT, Ramesh Raskar, emailed Dr. Nalwa for help in producing seamless panoramas despite having Nalwa 1996. NR at ¶103 n. 14.

3. NSF redirected its funding from UNC to USC starting around 2000, soon after or around when USC purchased FullView's FC-1005 camera. Nalwa Decl. at ¶7.

4.  Every art that Polycom has cited from after Dr. Nalwa's '711 Patent's priority data in 1995 cites Nalwa 1996. NR at ¶211 n. 21.

This Court, Polycom, and even Mr. Keller have relied on Dr. Nalwa for his technical analyses. This evidence suggests that Dr. Nalwa is an acknowledged ***and reliable*** authority in the field to which his patents are directed notwithstanding Polycom's allegation that, "At most, he [Dr. Nalwa] has some expertise in technical issues concerning the patented technology." Motion at 2. Thus, Dr. Nalwa is amply qualified to explain the technical value of any of his patents to any product and, therefore, to speak to apportionment of portfolio royalty between these patents. Dr. Nalwa's expert report provides the extensive detail that a cross-examiner would need to understand the reasoning that Dr. Nalwa applied to reach his conclusions — for the cross-examiner to independently assess the conclusion's reliability and then extensively test this reliability at trial.

## 2.  On The M–P License

Polycom also seeks to exclude Dr. Nalwa's testimony and opinions on the M–P License on the grounds that these constitute contract interpretation, which is a "legal" task, and that Dr. Nalwa is not qualified for this task because he is not an attorney or a legal expert. But Dr. Nalwa has decades of experience negotiating contracts and licenses without advice of counsel, contracts and licenses he presumably understands and interprets before he signs them. NR at ¶7, Nalwa Decl. at ¶2. Pertinently, when the interpretation of the Polycom IPA was at issue between the parties, Dr. Nalwa's interpretation prevailed over that of Polycom's counsel in the ensuing arbitration between the parties. NR at ¶¶269–273.

None of the interpretations of provisions of the M–P License that Dr. Nalwa provides is particularly controversial. As Dr. Nalwa explains in detail in his report, Polycom's motivation to make and sell the accused products was to comply with provisions of the M–P License. Mr. Bakewell agrees. As Dr. Nalwa has further explained, ECF 276-2 at ¶40(ii),

> … Whereas Mr. Bakewell purports, *e.g.,* at ¶209, that making and selling the accused products was a money-losing proposition for Polycom from beginning to end, from 2013 to 2018, he does not pause to explain why then did Polycom keep meeting its obligations to Microsoft under the M–P License, rather than terminate the M–P License. He does not dispute Mr. Ramadas' explanation at ¶¶79–80 of why this license was so important to Polycom despite this license requiring

Polycom to (a) license FullView's patents, (b) not deviate from the licensed design, and (c) improve product quality — all three of which serve to preclude non-infringing alternatives. As Mr. Ramadas opined based on documents produced in this case, Polycom did not abandon the M–P License because it gave Polycom access to "hundreds of millions" of Microsoft's customers. Although Mr. Bakewell does not contest this, he nevertheless maintains that the M–P License is irrelevant.

Polycom has no basis to disregard the M–P License. It says the M–P License is not a "comparable license." FullView and its experts agree, and have never opined otherwise. But the M–P License is central to why Polycom would want a FullView license, as even Mr. Bakewell implicitly admits.

Both Dr. Nalwa's interpretation of the term "necessary" in the M–P License — as requiring Polycom to acquire a license to FullView's patents — and Dr. Nalwa's interpretation of provisions of the M–P License setting forth the requirements for the development of new products conform to the ordinary and customary meaning of words. Polycom does not provide any alternate interpretation of either. The onus in on the party seeking to interpret words contrary to their plain meaning to provide evidence to support the sought interpretation. Polycom previously challenged Dr. Nalwa's interpretation of "necessary," but additional evidence surfaced thereafter that affirmed Dr. Nalwa's interpretation. And so, while Polycom no longer can or does challenge Dr. Nalwa's interpretation of "necessary," it only now advances the argument that Dr. Nalwa is offering a legal conclusion that he is unqualified to proffer.

### 3. On Patent-Related Matters

Polycom also makes an issue of Dr. Nalwa opining on patent-related issues, including but not limited to whether he is qualified to opine on work products of Polycom's attorneys and on whether they performed due diligence. The evidence fully supports Dr. Nalwa's opinions.

Over and above Dr. Nalwa's extensive experience with successfully prosecuting numerous patents and his involvement in the present litigation that is in its fourteenth year, both in coordination with attorneys, Dr. Nalwa's expert report reveals how he independently reached the conclusion that *AstraZeneca* commends, that apportionment between the '711 and the '143 Patents is inapt here. Back in 2020, without advice of counsel, he concluded "this Court's §101 decision could become moot." NR at ¶309(ii). And in his report, one of his grounds for not apportioning royalty between the '711 and the '143 Patents — "To exploit an invention, one must know how to

practice [it] ***gainfully,***" NR at ¶¶346–348 — is essentially the same as *AstraZeneca's.* Dr. Nalwa's patent-related skills are thus amply demonstrated even within the four corners of this litigation.

Although *AstraZeneca* renders FullView's Licensing Policy moot as far as apportionment, and Polycom correctly observes that such policy is not dispositive of apportionment, this policy it not irrelevant to apportionment. Polycom leaves out context Dr. Nalwa provides. *See* NR at ¶333.

**D. The Ramadas Expert Report is Independent**

Polycom requests the Court to "exclude the opinions of Mr. Ramadas for the independent reason that his uncritical reliance on the opinions of another calls into question his own reliability." Motion at 21. It alleges Mr. Ramadas demonstrates "unblinking reliance" on Dr. Nalwa's opinions. Motion at 7, 21. The evidence fails to substantiate these allegations and suggests just the opposite.[6]

Mr. Ramadas reviewed hundreds of relevant documents cited in the 339 footnotes in his report and also extensively in his exhibits — documents such as all emails relating to the 2011-2012 license negotiations — to avoid any cherry picking of the evidence, and reached his own opinions. Mr. Ramadas relied on Dr. Nalwa primarily for guidance on certain technical matters for which Dr. Nalwa provided ample support in the record. In just a few instances, Mr. Ramadas also relied on Dr. Nalwa's experience as FullView's chief officer who was involved in negotiating license agreements on behalf of FullView. Such reliance on other experts is a common practice in patent infringement matters. In fact, *Georgia-Pacific* Factor 14 specifically relates to "the opinion testimony of qualified experts." Polycom's own damages expert, Mr. Bakewell, relies heavily on Mr. Keller's opinions.

Polycom deposed Mr. Ramadas and had the full opportunity to question him on any relevant matter, as Polycom will have the opportunity to cross-examine Dr. Nalwa at trial.

Polycom's principal citation for the exclusion of an expert's opinion based on unblinking reliance on another expert's opinion, which is certainly not the case here, is *Pascal v. Nissan N.A., Inc.*, 2022 WL 19076763, at *16 (C.D. Cal. Dec. 21, 2022), which is distinguishable from this

---

[6] For instance, Mr. Ramadas's ***upper value*** of "a reasonable royalty" is roughly two thirds a ***lower bound*** on "a reasonable royalty" in FullView's Amended Damages Contentions (ECF 251-4 at 21) from ***an*** approach apparently supported by Polycom's expert Mr. Bakewell. BR at ¶15 n. 14.

case. There, the expert's opinion relied entirely on another expert's testing that followed an unreliable methodology, resulting in "too large an analytical gap between the data and his conclusions." *Id.* at *17. The testing itself also failed to comply with the requirements for class certification, relying on a single vehicle to accuse an entire class of vehicles with a product defect where the defect was one influenced by driver and road idiosyncrasies. *Id.* at *12, *17. Here, the issues upon which Mr. Ramadas relied on Dr. Nalwa were ones of experience rather than testing and subject to ready testing by cross-examination.

Polycom's other case of unblinking reliance, *Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 2628620, (C.D. Cal. Mar. 15, 2023), is also entirely distinguishable. There the issue regarding expert exclusion centered on whether her expertise as a dermatologist qualified her to interpret a document called an AC Equivalency Statement. According to the opinion, "[d]efendant does not even attempt to link Dr. Arron's qualifications in dermatology to her ability to independently evaluate the AC Equivalency Statement." *Id.* at *9. The court provided an alternative basis for exclusion as well: "Even if this Court were to accept that testimony as to her qualifications, this Court would nonetheless exclude her opinions because Dr. Arron does not adequately explain what, if any, methodology she used to independently assess the data in the AC Equivalency Statement. Rather, she testified that she never inquired about or communicated with the testing laboratory; she did not reproduce (or try to reproduce) any of the experiments showing in the AC Equivalency Statement; and she assumed much of the truth of the facts stated in the AC Equivalency Statement based on the very fact that it was within the AC Equivalency Statement." *Id.* at *10. Unlike here, the plaintiff there had no opportunity to question the scientist who prepared the AC Equivalency Statement upon which the defendant's expert relied.

**E. FullView's Response to Opinions and Testimony Polycom Seeks to Exclude**

In the tables shown below, one table for each of Dr. Nalwa and Mr. Ramadas, FullView addresses the main categories of opinions and testimony that Polycom seeks to exclude. To be clear, even where FullView agrees to exclude testimony or an opinion or doesn't address a specific opinion or testimony that Polycom seeks to exclude, FullView does not concede that Polycom has a valid basis to exclude that opinion or testimony, only that the opinion or testimony is immaterial

and addressing it would be a waste of judicial resources, or that it is subsumed by a listed category.

***FullView agrees not to present to a jury, unless the door is opened by Polycom, only ¶¶30(vi)(B), 92(vii)(B), 272, 273(iii), 277, 279, 281, 309(iv)(b)–(c), and part of 332 from Dr. Nalwa's report.***

| Testimony and Opinions in Nalwa Expert Report That Polycom Seeks to Exclude | | |
|---|---|---|
| **Topic of Testimony** | **Basis for Exclusion Proffered by Polycom** | **FullView Response** |
| Apportionment | Apportionment is always apt is dictated by "a century of controlling precedent" | Neither FullView's Licensing Policy nor other reasons in Dr. Nalwa's report to not apportion are offered as dispositive. What is controlling is the holding in *AstraZeneca*. FullView objects to the exclusion of ¶¶94, 106–131, 219, and 331–335 except for this in ¶332: "It is then baseless, in my opinion, to apportion royalty to FullView's individual patents — given that" |
| Non-Technical Issues | Dr. Nalwa is unqualified to opine or offer testimony on anything except perhaps some technical issues | Polycom shows total disregard for *Daubert* and for Dr. Nalwa's demonstrated expertise in a range of areas, including in contract interpretation vis-à-vis Polycom's attorneys, and in data analysis vis-à-vis experts at Bell Labs. FullView objects to excluding any testimony or opinion *en masse*, such as ¶¶61–159, 316–390, paragraphs that *inter alia* collate and describe the evidence — including the patents and licensing negotiations — apportionment, and technical analyses. |
| Motivations | Speculation | FullView objects to the exclusion of ¶169, ¶171, and ¶185 because FullView's conclusions are not speculative but well-reasoned. Polycom cannot point to any flaw in the reasoning. |
| Rule 408 | Settlement Privilege | FullView agrees not to present to jury, unless door opened by Polycom, ¶¶30(vi)(B), 92(vii)(B), 272, 273(iii), 277, 279, 281, and 309(iv)(b)–(c). FullView objects to the exclusion of ¶¶275–276, 278, 280, 282, rest of 309. |
| Licensing Policy | Irrelevant to Apportionment | This is wrong, although licensing policy is not dispositive of apportionment, it is not irrelevant to apportionment. FullView objects to the exclusion of ¶¶94, 106–131, 219, and 331–335. |
| "purported value of the '143 patent to Polycom's higher-definition products" | "because it does not link demand for the accused device to the incremental value of the '143 patent over conventional solutions" | This goes to apportionment. Moreover, Dr. Nalwa is opining only on the technical value of the '143 Patent to various resolution products. His valuation of the economic impact of the '143 Patent at different resolutions is fully supported by the licensing negotiations between the parties, a point |

| | | |
|---|---|---|
| | | Polycom does not address. FullView objects to exclusion of ¶¶316-317 and 351-357. |
| Non-infringing alternative ("NIA") cannot fall short of invention | Alternatives inferior to infringing alternative are relevant to reasonable royalty analysis | One, Polycom has not demonstrated any "NIA" acceptable for videoconferencing, the intended application. Two, the M–P License does not allow regressive products. Three, the M–P License does not allow deviation from infringing design of RT. So, there is no NIA. FullView therefore objects to exclusion of ¶¶58-60, 365. |
| Patents not practiced in product are irrelevant to apportionment | Patents not practiced in product should be included in apportionment because the "right to use" them adds value to license | This issue goes to apportionment, a matter on which Polycom has not provided its own assessment other than criticizing FullView for excluding the '711 patent despite it being ruled unpatentable. First, as Dr. Nalwa explains, none of these patents were considered infringing at the time of negotiation, nor were they expected to be practiced in future RoundTable products. Second, all licenses and licensing negotiations were for only videoconferencing products. Third, the resolution limit demanded by FullView restricted which patents could be practiced. Polycom misrepresents Dr. Nalwa's full analysis, which includes patents that were neither practiced nor anticipated to be practiced and explains how Polycom was restricted to videoconferencing cameras using the Roundtable design. FullView therefore objects to exclusion of ¶¶ 319–328, and 346–357. |
| Interpretation of M–P License | Legal issue | Dr. Nalwa is qualified to speak to the straight-forward language and technical aspects of the M–P License based on his experience in negotiating contracts, including IP license agreements. He has decades of experience with contracts and agreements, including when he went head-to-head against Polycom's attorneys on the interpretation of the termination clause in the Polycom IPA, and prevailed with costs. FullView therefore objects to exclusion of ¶¶177, 174–183. |
| "FullView narrowly escaped Polycom's attempted heist .." | Baseless | Dr. Nalwa now explains his basis for this observation: A widely accepted principle of law mandates that damages increase with the likelihood of a guilty defendant going scot-free. Nalwa Decl. at ¶10. FullView objects to the exclusion of ¶261. |
| Soundness of Polycom attorney work | Unqualified | Dr. Nalwa has decades of exposure to patents, patent attorneys, and patent law, and provides a reasoned analysis. Polycom does not and cannot contest the facts, or fault the analysis. Though, as |

| | | trial approaches, FullView will request to stipulate as to the facts reflected in the Polycom documents and their admissibility. FullView objects to exclusion of ¶¶284–299. |
|---|---|---|

| Testimony and Opinions in Ramadas Expert Report That Polycom Seeks to Exclude | | |
|---|---|---|
| **Topic of Testimony** | **Basis for Exclusion Proffered by Polycom** | **FullView Response** |
| Apportionment | Blindly adopts Nalwa positions on economic value of the patents. | Mr. Ramadas does not blindly adopt any opinion of Dr. Nalwa relating to economic value (which Dr. Nalwa did not even provide). Mr. Ramadas reviewed hundreds of relevant documents (cited in the 339 footnotes in his report and also extensively in his exhibits) and reached his own opinions. Mr. Ramadas relied on Dr. Nalwa primarily for guidance on certain technical matters for which Dr. Nalwa provided ample support in the record. In just a few instances, Mr. Ramadas also relied on Dr. Nalwa's experience as FullView's chief officer who was involved in negotiating license agreements on behalf of FullView. Reliance on other experts is a common practice in patent infringement matters — in fact, *Georgia-Pacific* Factor 14 specifically relates to "the opinion testimony of qualified experts." Polycom's own damages expert, Mr. Bakewell, relies heavily on Mr. Keller's opinions. |
| Apportionment | Did not independently assess the premise that the '143 patent exclusively drives demand for the accused products and that every other patent in the IPA has zero value.<br><br>The "No Apportionment" calculation is also inadmissible because it effectively results in awarding damages to FullView for the '711 Patent which this court invalidated. | As an initial matter, this is a false statement. Neither Dr. Nalwa nor Mr. Ramadas claim that "every other patent in the IPA has zero value."<br><br>As detailed in Dr. Nalwa's report, the '143 Patent AND the '711 Patent are the key patents in the IPA, with the others having *de minimis* value to either party in any license between them. The '711 Patent describes the theoretical underpinning of FullView's core invention and the '143 Patent teaches how to practice the '711 Patent's invention robustly, accurately, compactly, and practically. The importance of the '143 Patent is increasingly important at higher resolutions.<br><br>None of the damages opinions proffered by Mr. Ramadas are for the '711 Patent — they are all for the '143 Patent. |

| | | |
|---|---|---|
| | | Also, it appears that Polycom expects Mr. Ramadas to provide an independent assessment of the importance of the '143 Patent to the accused products. This is neither appropriate nor reasonable. Mr. Ramadas is not a technical expert and thus cannot provide opinions on the technical merits of the asserted patent.<br><br>Further, Mr. Ramadas' highly conservative Apportionment Scenario 2 assumes that the entire value of the license to the lower resolution CX5000 is attributable "to the '711 Patent (and other patents that are part of the portfolio)." (Ramadas Second Errata, #7). In this scenario, Mr. Ramadas opines that only the *difference* between the non-apportioned royalty for the Accused Products and the royalty for the lower resolution CX5000 can be attributed to the '143 Patent. |
| Apportionment | Apportionment scenarios rely exclusively on the opinions of Dr. Nalwa. | This is not true. Mr. Ramadas' very conservative "Apportionment Scenario 2" does not rely on Dr. Nalwa's opinion. In this scenario which provides a floor for royalty damages, Mr. Ramadas conservatively assumes that none of the value of the license to the lower resolution CX5000 can be attributed to the '143 Patent. Dr. Nalwa does not claim this: In fact, Dr. Nalwa's opinion is that the '143 Patent is important even at lower resolutions. (NR at ¶353.) Mr. Ramadas provides this scenario to illustrate the incremental value of the '143 Patent to the accused products even under the extremely conservative assumption that the '143 Patent is not important to the lower resolution CX5000 (an assumption that is not based on Dr. Nalwa).<br><br>In the other two apportionment scenarios provided by Mr. Ramadas, he relies on Dr. Nalwa's opinions on the technical benefits and importance of the '143 Patent to the accused products. |
| Apportionment | Even under Apportionment Scenario 2, Mr. Ramadas (echoing Dr. Nalwa) attributed all additional value of the accused higher-resolution products to the '143 Patent. | Polycom appears to fault Mr. Ramadas for relying on Dr. Nalwa's technical expertise on the importance of the '143 Patent to the higher resolution products. As mentioned previously, Mr. Ramadas is a damages expert, not a technical expert, and thus is not qualified to provide independent opinions on the technical merits of the '143 Patent. |

| Willingness to accept anchored on 5% to 5.9% of MSRP | Did not independently assess whether the 5% to 5.9% rates are founded in an acceptable methodology or theory. | Polycom's claim substantially misconstrues Mr. Ramadas' analysis in his report. The 5% figure is based on the contemporaneous documents and correspondence prior to and around the time of the hypothetical negotiation. In particular, the 5% is from the documents relating to the licensing negotiations between FullView and Polycom. (*e.g.,* RR at ¶¶64(b), (d).) The 5.9% is from Dr. Nalwa's technical analysis of how the royalty would increase based on a higher resolution limit. As discussed in the contemporaneous documents and cited in Mr. Ramadas' report, "FullView [] emphasized the importance of resolution as being a key factor in the determination of a royalty rate." (RR at ¶66 and FULLVIEW005157.) With the details of the accused products being described in documents Polycom produced in this litigation, proof that the accused products actually needed a resolution limit of 15MP is now available — and not 10MP or 12MP, as discussed between the parties in 2011. The 5.9% rate was calculated as a simple extrapolation of the rates for the lower resolutions, an analysis that Mr. Ramadas corroborated and agreed with. (ECF 273-5, Tr. at 70:9–19) |
| Reliance on other experts | An expert who does not address the validity of the opinions of another expert that he relies on and shows unblinking reliance on another's opinions should be excluded (citing *Pascal v. Nissan N.A., Inc.*, 2022 WL 19076763, at *16 (C.D. Cal. Dec. 21, 2022) (Also citing *Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 2628620, at *10 (C.D. Cal. Mar. 15, 2023) (quoting *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985)) | It is common practice for experts to rely on other experts, especially in patent infringement matters. The Federal Circuit has stated that "[n]umerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703." *Apple Inc. v. Motorola, Inc.*, 757 F. 3d 1286, 1321 (Fed. Cir. 2014) (citing *Monsanto Co. v. David*, 516 F. 3d 1009, 1015-1016 (Fed. Cir. 2008)). The Federal Circuit has further noted that "[c]onsistent with Rule 703, patent damages experts often rely on technical expertise outside their field when evaluating design around options or valuing the importance of the specific, infringing features in a complex device … Patent damages calculations are often intertwined with highly technical issues precisely because damages must be based on the scope of infringement, often an involved technical question." *Id*. In addressing the question of potential expert bias, the Federal Circuit held that "[w]hile it may be true that the potential for bias is an inherent concern with respect to all hired expert's, this concern is addressed by the weight |

| | | given to the expert's testimony, not its admissibility." *Id.* |
|---|---|---|
| | | As discussed above, the cases cited by Polycom are not relevant to this matter or even generally to the specific dynamics of patent infringement matters. *Pascal v. Nissan N.A., Inc* is a class certification matter in which one expert's opinion relied entirely on another expert's testing methodology, which failed to comply with the requirements for class certification. Both of the referenced experts in *Pascal* were engineers with similar experience in testing. The second expert claimed to have independently verified the results of the testing expert. However, the court disagreed that the second expert had performed an independent test and therefore excluded his opinions on the basis that he relied on the testing expert's methodology, which the court also excluded. *Gunaratna v. Dennis Gross Cosmetology LLC*, 2023 WL 2628620 (C.D. Cal. Mar. 15, 2023) is also distinguishable as discussed above. These were not cases where a damages expert relied on the opinions of a technical expert. |

## IV.  CONCLUSION

For all the foregoing reasons, FullView requests that the Court deny Polycom's motion to exclude expert opinions and testimony of Dr. Nalwa and Mr. Ramadas excepting the paragraphs in Dr. Nalwa's expert report identified by FullView herein to which Polycom objects. FullView agrees to not introduce these paragraphs at trial unless Polycom opens the door to them.

Dated: June 5, 2025

Respectfully submitted,

*/s/ Bruce Wecker*

BRUCE WECKER (CA Bar No. 078530)
bwecker@hausfeld.com
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
415-633-1908 tel., 415-358-4980 fax

*Attorneys for Plaintiff FULLVIEW, INC.*

1

## __ECF CERTIFICATION__

2

3      I, Bruce Wecker, am the ECF user whose ID and password are being used to file this

4  **OPPOSITION TO POLYCOM'S MOTION TO EXCLUDE EXPERT OPINIONS.**

5

DATED: June 5, 2025                    _/s/ Bruce J. Wecker_____
6                                                 Bruce J. Wecker

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Bruce Wecker, declare that I am over the age of eighteen (18) and not a party to the entitled action. I am of counsel at the law firm of HAUSFELD LLP, and my office is located at 600 Montgomery Street, Suite 3200, San Francisco, California 94111.

On June 5, 2025 I caused to be filed the

**OPPOSITION TO POLYCOM'S MOTION TO EXCLDUE EXPERT OPINIONS**

with the Clerk of the Court using the Official Court Electronic Document Filing System, which served copies on all interested Parties registered for electronic filing.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: June 5, 2025                    /s/ *Bruce J. Wecker*
                                       Bruce J. Wecker